IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRISTOPHER R. BONANDER.

Petitioner,

v.

PATRICK COVELLO,

Respondent.

No.  2:23-CV-1025-DJC-DMC-P

FINDINGS AND RECCOMENDATIONS

Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254. Pending before the Court are Petitioner's petition for a writ of habeas corpus, see ECF No. 1, Respondent's answer, see ECF No. 14, and Petitioner's traverse, see ECF No. 15.  Respondent has lodged the relevant state court records, see ECF Nos. 12 and 13.

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  Under AEDPA, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in

/ / /

/ / /

1

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at

2

406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76. This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 223 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the

3

state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

## I. BACKGROUND

### A. Facts[1]

The California Court of Appeal recited the facts of the case in its decision on direct appeal, and Petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct. See EFC 13-5 at 3-11. The parties are familiar with the factual findings made by the appellate court and will not repeat them here.

### B. Procedural History

The Court of Appeal recited the following procedural history following trial:

> On February 4, 2019, the jury convicted defendant of oral copulation of a child, Jane Doe 1 (Pen. Code, § 288.7, subd. (b); count I), two counts of lewd acts on a child, Jane Doe 1 (id., § 288, subd. (a); counts II & III), and two counts of exhibiting harmful matter to a minor related to Jane Doe 1 and Jane Doe 2 (id., § 288.2, subd. (a)(2); counts IV & VII). The jury found the multiple victim enhancements attached to counts II and III not true, and was deadlocked on counts V and VI, which alleged defendant committed lewd and lascivious acts upon Jane Doe 2 (id., § 288, subd. (a)). Therefore, the trial court declared a mistrial on counts V and VI.
>
> On November 4, 2019, the trial court sentenced defendant to 15 years to life for count I, plus an aggregate determinate term of 10 years 8 months for counts II, III, IV and VII. The aggregate determinate term consisted of the middle term of six years for count II, plus one-third the midterms for the remaining counts—two years for count III, two years for count IV, and eight months for count VII. The court also imposed various fines and fees, including a $900 presentence probation report fee under Penal Code section 1203.1b.
>
> ECF No. 13-5, pg. 11.

///

///

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence. See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012). Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

On appeal, the government conceded that a two-year sentence reflects in the abstract of judgment on count IV was the result of a clerical error and further conceded that the abstract of judgment incorrectly reflects a presentence report fee.  See id. at 2.  The Court of Appeal affirmed the judgment and conviction except as to the improper two-year sentence on count IV and the improper fee.  See id. at 39-40.

Petitioner filed a petition for review in the California Supreme Court, see ECF No. 13-6, which was denied without comment or citation, see ECF No. 13-7.  Petitioner did not file any post-conviction actions in state court.

## II.  DISCUSSION

Petitioner raises two claims for habeas relief.  In Ground One, Petitioner argues that the trial court erred by improperly admitting evidence at trial.  See ECF No. 1.  In Ground Two, Petitioner claims that the trial court erred by denying a timely request for a continuance to obtain additional discovery.  See id.

### A.      Ground One – Trial Court's Evidentiary Ruling

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not available for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process."  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  Because federal habeas relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal

habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see also Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994).   To raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).   In any event, an evidentiary error is considered harmless if it did not have a substantial and injurious effect in determining the jury's verdict.  See Padilla v. Terhune, 309 F.3d 614, 621 (9th Cir. 2002); see also Laboa v. Calderon, 224 F.3d 972, 976 (9th Cir. 2001).

Petitioner's claim that the trial court improperly admitted evidence was addressed by the California Court of Appeal on direct review.  The state court described the issue as follows:

> Defendant claims the trial court's admission of his statements to S.P. during the pretext calls violated his Fourteenth Amendment right to due process. He asserts the statements should have been excluded because they were coerced, involuntary, and the product of implied leniency made while S.P. was acting at the behest of Detective Redd, and, thus, as a state actor. The People disagree, contending S.P. was a private citizen, so defendant's statements to her did not implicate his constitutional rights and his confession was voluntary.
>
> ECF No. 13-5, pg. 12.

The Court of Appeal then offered the following summary of additional relevant facts and procedural history:

> During motions in limine, defendant sought to exclude the statements he made during the pretext calls with S.P., asserting they were "coerced by law enforcement." He claimed S.P. was acting on law enforcement's behalf, and the statements violated his Fifth Amendment right to remain silent. The issue was submitted on the transcripts of the recorded phone calls. During argument, both parties agreed that the pretext phone calls were "enacted by request of" law enforcement. Defendant argued his statements were involuntary because S.P. pressed him when he did not confess or admit to anything, "using his vulnerability to their relationship and his emotions for her, as well as implying promises that she would be able to drop charges in the event that he told her the truth."

///

6

The trial court reviewed the transcripts of the pretext phone calls and asked, "Did law enforcement, aside from instructing that the phone calls be recorded, provide any instructions as far as what concessions should be made or what promises should be made …." Defense counsel replied, "[S.P.] called Detective Redd and told him, 'He's about to tell me everything. What do I do?' And his instructions back to her was something along the lines of find a way to record it." The People agreed "the direction was find a way to record it" and all parties agreed "[t]hat was the only direction provided by law enforcement."

In the first recorded phone conversation with defendant on May 25, 2016, S.P. told defendant the girls told the counselor "a lot of stuff" and she needed to know what happened. S.P. told defendant, "I really want us to, like, be together and I'm really—really trying to—I don't know. Just wrap my head around it. I—I love you and, um, pretty much everything that was said, um, I—I—you know—I need you to be honest with me." Defendant said, "I told you everything. I don't know what else there is to tell." S.P. said, "I'm calling you to—because I trust you. And I know you're gonna tell me the truth and we can—we can move past it. And we can get through this whole thing together. But I—I just—I know something was said and I need you to tell me." Defendant eventually admitted that the girls may have seen a video so he pulled Jane Doe 2 into the bedroom to talk with her about what she saw. Defendant said there was a pink vibrator left on the bed and Jane Doe 2 put it on her neck. When defendant denied putting the black rock vibrator on Jane Doe 1, S.P. accused him of lying. S.P. told defendant, "If you seriously—seriously want us to ever—ever—ever in our lifetime be together and make this work I need the fucking truth right now or I'm—I'm not even—I can't do this. Right." S.P. said, "And you're not even big enough to freaking tell me it. And like I said. I told you we could move past this. I know you didn't have sex with them …. I know you didn't. And I will be by your side and I will stand by your side and I will stand, uh, anything I have to do to support you on this. But I have to know because it is going to come out. I told you the truth always comes out and it's—I need to hear it from you because I cannot handle any more strangers or counselors or freaking whatever calling me up or pulling aside to tell me that they're concerned about my eight-year-old daughter …." "[I]f you tell me the truth and you tell me exactly what happened then I know who [sic] to handle her." S.P. challenged defendant saying, "[Y]ou're not being honest with me. I don't feel like you're being honest." Defendant maintained he was being honest, he never touched her daughters, and he never intentionally showed them pornography.

In the second phone conversation between S.P. and defendant on May 25, 2016, S.P. began by asking defendant what he did to the girls and what he showed them. Defendant again suggested one of the girls may have accidentally seen a pornographic video. S.P. told defendant, "I just found out today that, um, that I'm able to drop the case if I want to." She said, "But I can't. I don't know. I just—I—I just need to believe what you're telling me is true …. I told you getting the trust back is gonna take a really long time …." S.P. told defendant she was having a hard time believing him and begged him to be honest and tell her the truth.

Again S.P. told defendant she wanted to "drop everything," but she could not; she did not know how to help her daughter. She told him she felt like he was not being completely honest and "we can't be together anymore, I just—I don't know. And that's not what I want but …." S.P. told defendant she did not want to live without him in her life, and she

could forgive the mistakes he made but she could not forgive the lying. "I want to just drop everything and tell [my ex-husband] it was a mistake but I need to know everything so I can keep my mouth shut and tell the girls to keep their mouth shut and I want you guys to move back in, I want you to be here, I frickin' hate this." S.P. said she missed the boys and their times together and she needed to know why he licked her daughter's potty. Defendant maintained he did not lick Jane Doe 1's "potty," but he confessed Jane Doe 1 had seen several pornographic videos. He also admitted he saw Jane Doe 1 putting his vibrating razor "down there," and he told her "there's toys that do the same thing" and "they're stronger."

S.P. told defendant she appreciated him being honest with her, she loved him and wanted to give him a hug, and she wished he had just told her this from the beginning. Defendant said Jane Doe 1 "asked [at least 10] times for me to lick her and do what she saw on the video and I told her no." Defendant was adamant he never licked the girls or touched them, but there were times Jane Doe 1 grabbed his hand and pulled it between her legs. Defendant said, "[D]o you know how hard it is to tell you this?" S.P. told defendant she felt like there was still more he had not told her. Defendant admitted he was holding back by not admitting Jane Doe 1 had seen the videos or confessing he told Jane Doe 1 how to use the toys and where to put them. S.P. said "I want you—you and the boys to move back in pretty soon. I just need you to promise that—that that will never happen again." When S.P. ended the call thanking him for telling her the truth, defendant asked, "Am I gonna be arrested now?" S.P. responded, "Be arrested for what? I don't know."

In the third phone call on May 25, defendant told S.P. "[t]hey're not lying" "[a]bout anything." He admitted there were a few times Jane Doe 1 had played with the sex toys. He said Jane Doe 1 slid her pants off and pulled up her shirt and he licked her vagina, but he claimed Jane Doe 1 initiated the incident. He thought he was "showing her something cool and amazing" but told her, "[T]his is very wrong. We shouldn't even be doing this." S.P. asked defendant if he was telling the truth about it only happening one time, and he said he did not think there was another time because Jane Doe 1 did not like his "whiskers" on her. S.P. reminded defendant he shaved his whiskers off. Defendant maintained he did not use toys on Jane Doe 1; he gave them to her to use on her own. Defendant admitted he offered to lick Jane Doe 2's potty. Defendant denied trying to put the toy or his hand down Jane Doe 2's pants. Defendant admitted that he told Jane Doe 1 that she could not tell anyone about this. Defendant said the girls never touched his privates.

S.P. thanked defendant for telling her everything. S.P. asked, "Were you ever going to tell me?" and defendant answered, "In my head I was thinking if this all goes away I could tell you everything." He said he did not want to tell her, "I just really, I couldn't bring myself to tell you. I was afraid you would just go away and never see me again." Again, S.P. thanked defendant for finally telling her and defendant responded, "Yeah. It's weird 'cause this is like me admitting it to myself too. I was just denying … that I even did that." He admitted it was wrong and said, "Sorry, I'm so fucked up in the head." Near the end of the call, defendant again apologized and said, "I'm sorry and whatever decision you make, I respect that." S.P. responded, "I'll probably need some time to think about this."

/ / /

In the first call on May 31, S.P. asked about the "toys." Defendant claimed Jane Doe 2 turned on one of the sex toys and put it on her neck; he then joked about putting the toy on her. Defendant admitted he licked Jane Doe 1's vagina. Defendant asked S.P., "Are you recording me, is this going to the cops and I'm going to jail or something?" S.P. responded, "Dude, I'm not smart enough to record you. I was just sitting there jogging and jogging and jogging and everything you said didn't make any sense." Defendant said, "Yes, I am an idiot. I fucking screwed up and I don't know what to tell you. I fucking—I'm fucking stupid." Again, defendant maintained he did not use the sex toys on the girls, but he had explained to Jane Doe 1 what the toys did and told her where to put them. Defendant showed Jane Doe 1 videos about how to use the sex toys. Although S.P. continued to challenge defendant, he was adamant he did not show or offer to show the girls his penis, and he was never naked in front of them. S.P. told defendant she thought he was lying. Defendant was adamant he was not lying and stated he had told her the truth about everything.

In the second call on May 31, defendant called S.P. to tell her, "[Y]ou are more important to me than sleep, so I am talking to you. I need to tell you the truth." Defendant said, "[W]hat you said that day was true." Defendant asked S.P. if she was going to involve the police or drop the case. S.P. responded, "[I]f I can prove to them that you didn't do anything. But if I know everything I know what—I don't want to look like a liar so I need to know everything. But if my girls are saying one thing, like they're saying—they're saying a whole bunch of stuff and I can't sit there and make it sound like they're making things up if I don't know the truth. I can't—I can't build on that, ya know?" S.P. explained the girls were telling her new things. Defendant denied the new allegation he had masturbated in front of Jane Doe 1 and Jane Doe 2. S.P. said, "I'm not going to go in and tell them I want to drop the case and all this stuff. When new stuff keeps coming up. Like, I'm not gonna …." Regarding putting his mouth on Jane Doe 1, defendant said, "I fucked up. I've told you this. I don't know what I was thinking. I should have never have done that. I should never—never done that. I should have never ever showed her a single video. Like, I seriously regret everything I did. I feel stupid. I don't know what to tell you. I feel stupid. I feel really—really stupid and ashamed." Defendant apologized multiple times throughout the conversation. After S.P. confronted defendant saying, "You would not have stopped, and you would have kept going." Defendant responded, "This is why I am going to counseling to figure out what the fuck is wrong with me. Why I would do this in the first place, okay? 'Cause I don't even know." Defendant said, "I've told you the truth, I've told you everything. You're going to do what you want with it. I don't know what you're going to do. I don't know what to tell you anymore. I have a problem and I'm going to go see someone about [it]. And listen, if you want to work things out, I want to work things out. I love you. I've told you the truth, I've told you everything. I don't know what else to tell you. I don't know what else to say. You are asking impossible questions for answers that I don't have answers to."

Upon review of the transcripts of the phone calls and the arguments made by the parties, the trial court found "[defendant's] statements are admissible and are not the product of coercion, at least not by the state of California." First, the trial court stated it "had a hard time determining state action in this case," noting S.P. acted with assistance from the police, but defendant was not in custody and the charges did not appear to have been filed at the time. The trial court stated, however,

9

"even if [S.P.] was acting at the direction of law enforcement, the totality of circumstances is still such that this was not a custodial interrogation, but inherently coercive aspects of that process were not present here. [¶] [Defendant] was not aware that [S.P.] was acting on behalf of the state of California, certainly could have hung up the phone at any time and terminated the conversation. [¶] So I cannot conclude that his statements were made involuntarily, although it certainly seems that it would be an issue at trial, the motivation for the statements, but I can't say that they were not the product of his free will. [¶] So his statements will be admitted. I find there is no Fifth Amendment violation with these witness statements."

ECF No. 13-5, pgs. 12-18.

The appellate court held that Petitioner's constitutional rights were not violated based on the following analysis:

Initially we note defendant does not offer any cases specifically addressing the determination of whether a citizen acts as a de facto state agent in the context of involuntary confessions. However, the test for de facto agency can be seen in the Fourth, Fifth and Sixth Amendment contexts.

In *People v. Wilkinson* (2008) 163 Cal.App.4th 1554, the Third Appellate District stated, "'… [T]wo primary factors … should be considered in determining whether a search conducted by a private person constitutes a Government search triggering Fourth Amendment protections. These are: (1) whether the Government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation. [Citations.]'" (*Id*. at p.1566.) In *Wilkinson*, the court found insufficient government participation to implicate the Fourth Amendment where the police did not initiate the search and the citizen's dual motive for the search was to help the police and to recover her items from the defendant. (*Wilkinson, supra*, at p. 1569.)

Similarly, here, while the police instructed S.P. to record her phone calls with defendant on May 25th, the record also reflects S.P. recorded the third call on May 25th on her own, after the police left. S.P. recorded that call without the police being present. Additionally, consistently throughout the recorded pretext calls, S.P. expressed her desire for defendant to tell her the truth. While S.P. may have been motived in part to help police get a confession, the evidence reflects this motive was coupled with S.P.'s personal desire to know the truth and whether she and defendant could continue to have a relationship. Therefore, the evidence supports a conclusion S.P. was not acting as a de facto state agent.

S.P.'s actions are also analogous to those at issue in *People v. Martin* (2002) 98 Cal.App.4th 408, which addressed agency in the context of the Sixth Amendment right to counsel under *Massiah v. United States* (1964) 377 U.S. 201, 206. In *Martin*, the defendant's girlfriend secretly recorded her conversations with the defendant using equipment provided by the police. The *Martin* court concluded the defendant failed to establish his girlfriend was acting as an agent of the state where "the police only facilitated the tape recording of the telephone conversations by providing a tape recorder." (*Martin, supra*, at p. 420.) It reasoned there was no evidence the government sought to obtain incriminating evidence against

10

the defendant by knowingly circumventing his right to counsel. (*Ibid*.)

Defendant claims the facts here differ from *Martin* because in *Martin*, the primary purpose for recording the conversation was not to obtain incriminating statements about the murder, but to document his threats against her. (People v. Martin, supra, 98 Cal.App.4th at p. 419.) Here, there was no evidence before the trial court at the suppression hearing regarding the purpose of the recorded phone calls. Rather, all parties agreed the only instruction the detectives gave S.P. was to record her phone calls with defendant. Again, the evidence appears insufficient to conclude S.P. acted as an instrument or agent of the state. (See *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 487.)

Defendant's reliance on *People v. Walker* (1972) 29 Cal.App.3d 448 and *People v. Sanchez* (1983) 148 Cal.App.3d 62 is misguided. Both cases address agency in the context of *Miranda*. In *Walker*, a psychiatrist who was summoned by the district attorney for the purpose of interrogating the defendant while in jail, and who was compensated by the district attorney, was considered a state actor. (*Id*. at pp. 453–454.) Similarly, in *Sanchez*, a doctor who was under contract with the state, and whose job it was to obtain incriminating evidence from the defendant while in custody, was considered to be an agent of the state. (*Id*. at pp. 68–69.) Unlike in *Walker* and *Sanchez*, here, defendant was not in custody at the time the pretext calls were made, and therefore, his confession did not implicate *Miranda* concerns. Further, S.P. was not hired by the prosecution or under contract with law enforcement. Thus, there was no preexisting relationship between S.P. and law enforcement like there was in both *Walker* and *Sanchez*, which made the doctors instruments of the state. (See *Coolidge v. New Hampshire*, supra, 403 U.S. at p. 487 [concerning a *Miranda* violation, the court stated a private citizen acts as an agent of the police for purposes of a criminal investigation when the person "in light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the state"].)

Upon review of all the circumstances, we cannot conclude the evidence established S.P. acted as an instrument or agent of the state. (See *Coolidge v. New Hampshire*, supra, 403 U.S. at p. 487.) Since the Fifth and Fourteenth Amendments only constrain governmental conduct, or conduct fairly attributable to the government, and not private citizens, there is no due process violation here. (See *Colorado v. Connelly*, supra, 479 U.S. at pp. 164–167 ["The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause"].)

Regardless, even assuming arguendo that S.P. was a de facto government agent, there is no evidence S.P.'s statements and questions to defendant were "'so coercive that they tend[ed] to produce a statement that is both involuntary and unreliable.'" (*People v. Maury, supra,* 30 Cal.4th at p. 411; see *Colorado v. Connelly, supra,* 479 U.S. at p. 164, fn. 2; *People v. Williams, supra*, 49 Cal.4th at p. 436 [question is whether the statement is product of an ""essentially free and unconstrained choice""]; *Lynumn v. Illinois, supra,* 372 U.S. at p. 534 [whether defendant's "'will was overborne at the time he confessed'"]; accord, *People v. Jenkins* (2004) 122 Cal.App.4th 1160, 1173–1174 [no coercion rendering admissions involuntary where defendant thought he was talking to a friend and was unaware fellow suspect was secretly recording at behest of police].) First, there was no evidence defendant's confession was obtained by any threats or violence, or by exertion of improper influence. (See *Maury, supra,* at p. 404.) There was also no evidence any physical

11

pressure was involved in obtaining his confession; defendant was not under arrest or in custody or any physical restraint. And, while defendant claims he was under psychological pressure, there was no evidence he was of less than average intelligence or had mental health issues. (See *People v. McWhorter, supra,* 47 Cal.4th at p. 347; *Williams, supra,* at p. 436.) Rather, the evidence shows defendant willingly participated in the phone calls. Indeed, defendant even initiated some of the calls and was free to end the conversation anytime. Therefore, there was no evidence defendant's will was overborne at the time he confessed. (See *McWhorter, supra,* at pp. 346–347; *Lynumn, supra,* at p. 534.)

Defendant also claims his statements to S.P. during the pretext calls were involuntary because they were the product of improper leniency, promises, and plays on defendant's emotions. Defendant contends he only made his statements because he believed S.P. would drop the charges. However, the record does not support defendant's claim that S.P. promised defendant she would drop the charges. Rather, S.P. expressed her desire to drop the charges, but she was clear she needed defendant to be honest with her.

S.P. made three references to dropping the charges in the second recorded conversation on May 25th, before defendant confessed to licking Jane Doe 1's "potty" and showing the girls sex videos. First, S.P. told defendant she found out she could drop the charges but said "I can't" and "I just need to believe what you're telling me is true." Here, S.P. is saying she "can't" drop the charges, even though she found out she could.

The second time, S.P. told defendant she wanted to drop everything but she couldn't without knowing how to help her daughters. The third time, S.P. told defendant she could forgive his mistakes but not the lying and that she wanted to drop everything but she needed to know everything. Nowhere is S.P.'s want or desire to drop the charges connected to a promise, only her desire for defendant to tell her the truth.

The second recorded phone call on May 25th ended with defendant asking if he would be arrested; S.P. responded, "[A]rrested for what? I don't know. I just know what the counselor told me and … I don't know what stuff she's gonna take or anything." Again, S.P. did not promise to drop the charges and even indicated she did not have the ability to control whether he would be arrested. This conversation occurred before defendant chose to text S.P. that the girls were not lying and before he confessed to performing oral sex on Jane Doe 1 and showing the girls sex videos. Defendant's statement to S.P. saying "I'm sorry and whatever decision you make, I respect that" after making his confessions further demonstrates he was not lured to make a false confession by any promise to drop the charges.

Moreover, the record does not support defendant's claim he made false confessions because of S.P.'s promises to reunite with him if he confessed. While S.P. told defendant that she loved him and wanted them to be together again, she never made any promises. Rather, S.P. told defendant that "getting the trust back is gonna take a really long time." S.P. maintained that she knew the truth, did not believe defendant was telling her the truth, and that he needed to admit the truth if there was a chance to save their relationship. Further, defendant revealed he had no expectation about their relationship after he told S.P. the truth, saying: "I've told you the truth, I've told you everything. You're going to do what you want with it. I don't know what you're going to do. I don't know what to tell you anymore. I have a problem and I'm going to go see someone about [it]. And listen, if you want to work things out, I want to work things

> out. I love you. I've told you the truth, I've told you everything. I don't know what else to tell you. I don't know what else to say."
>
> Upon review of the evidence, we cannot conclude there were promises made to defendant by S.P. that render his confessions coerced or involuntary. (*Colorado v. Connelly, supra,* 479 U.S. at p. 164, fn. 2.) Although S.P. made statements regarding her desire to drop charges or to get back together, the evidence does not substantiate defendant's claim S.P. made promises to defendant in order to get him to make false confessions. (See *People v. Thompson, supra,* 50 Cal.3d at p. 169 [there is a difference between a promise and a statement of fact or intention].) Therefore, we conclude the trial court did not err when it found the pretext statements admissible. (See *People v. Williams, supra,* 49 Cal.4th at p. 436 [statements are admissible when the product of the speaker's free will].)

See EFC 13-5, pgs. 20-25.

As the state court did, this Court will presume for purposes of this analysis that S.P. was a state actor. Assuming S.P. was a state actor, the Court agrees with the state court that the evidence does not support Petitioner's contention that his statements to S.P. were coerced or involuntary. First, there is no evidence Petitioner's statements to S.P during the various phone calls were the result of any threats of violence or improper influence. Instead, the evidence shows that Petitioner participated in the phone calls willingly. Second, there is no evidence of improper promises of leniency should Petitioner confess. To the contrary, while S.P. stated on numerous occasions that she would like to drop all the charges, she also said repeatedly that she simply could not because she needed to protect her children. More to the point, S.P. did not have the ability to "drop charges" filed on her behalf by the state's prosecutor. Finally, there is no evidence that S.P. promised to get back together with Petitioner if he confessed. Again to the contrary, the evidence demonstrates that Petitioner was well aware that, if he told the truth, S.P. would never reunite with him.

The Court concludes that the state court's determination that the trial court's evidentiary ruling did not violate Petitioner's due process rights is neither contrary to nor based on an unreasonable application of controlling United States Supreme Court precedents.

/ / /

/ / /

/ / /

/ / /

13

B.    **Ground Two – Trial Court's Denial of a Continuance**

Addressing this claim on direct appeal, the California Court of Appeal concluded that the trial court's denial of a continuance was not an abuse of discretion. See ECF No. 13-5, pgs. 35-38. In doing so, the Court of Appeal recited the following relevant factual background:

In June 2018, defense counsel filed a petition with the juvenile court pursuant to Welfare and Institutions Code section 827 and received the requested CPS incident reports in August of 2018. In reviewing these records, counsel discovered "the possibility of other sets of allegations unrelated to those in this case" that may contain allegations of sexual abuse made by Jane Doe 1 or Jane Doe 2. At the direction of the trial court, defendant filed another section 827 petition in juvenile court, but on January 2, 2019, the juvenile court informed defendant it would not rule on the new petition, stating it had previously been granted.

On January 8, 2019, with trial set to begin January 22, 2019, defendant filed a written motion to continue the trial pursuant to Penal Code section 1050. Defense counsel explained he had been attempting to subpoena additional documents from CPS based on separate incident numbers discovered in previously subpoenaed records. The People filed an opposition to the motion for continuance, noting there had been time to obtain any records, the grand jury indictment was filed March 9, 2018, and the victims in the case had a right to a speedy trial.

On January 11, 2019, the trial court held a hearing on the motion for continuance. In asking for a continuance, defense counsel conceded that "it was unknown what was contained in these additional records that counsel was seeking and that it was unknown how long counsel would need to secure them." Defense counsel admitted that it was unknown whether the records he was trying to obtain referenced defendant or not and admitted they could turn out to be completely irrelevant. He further explained that he was not actually waiting on records, but still needed to subpoena them after the juvenile court denied his petition.

The People argued there had been time to obtain these records. Further, the People noted the victims and their mother had been in court for every hearing and wished for the trial to go forward as this has been emotionally damaging to her to have to continue to prepare for testimony only to have it continued again. The People argued the case should have priority under Penal Code section 1048 because the victims are minors.

The trial court noted the records issue had "been present since day one, and this case has gone on way too long to figure that out." The court also stated that it sounded like the juvenile court had provided all the records they felt were necessary. Therefore, the trial court explained that in balancing the length of time counsel had to obtain the records, and the victims' speedy trial rights, there was no good cause to continue the case.

ECF No. 13-5, pgs. 35-36.

/ / /

/ / /

/ / /

14

Based entirely on application of state law, the Court of Appeal denied the claim, reasoning that the trial court did not abuse its discretion.  The court stated:

> Although defendant contends his counsel was diligent in trying to obtain the additional records, his request rested, in large part, on CPS records that may or may not provide exculpatory evidence. Defendant contends evidence of prior allegations of sexual misconduct would be relevant either as prior false accusations (see *People v. Miranda* (2011) 199 Cal.App.4th 1403, 1424; *People v. Franklin* (1994) 25 Cal.App.4th 328, 335; *People v. Adams* (1988) 198 Cal.App.3d 10, 18; *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1460) or to offer another explanation regarding Jane Doe 1's and Jane Doe 2's knowledge of sexual acts (see *People v. Daggett* (1990) 225 Cal.App.3d 751, 757). However, defense counsel admitted he had no information about the CPS records or whether they would have any relevance to the case. Further, the juvenile court ruled that defense counsel already had all the records. Therefore, there is no evidence demonstrating the existence of any likelihood of benefit from the additional CPS records. (See *People v. Doolin*, *supra*, 45 Cal.4th at p. 450; *People v. Hatt*, *supra*, 20 Cal.App.5th at p. 325.) There is also no evidence that the records would be material and not cumulative, or that the records could be obtained within a reasonable time. (See, e.g., *People v. Wilson* (1965) 235 Cal.App.2d 266, 273 [criteria for continuance in order to obtain witness]; see also *People v. Rhoades*, *supra*, 8 Cal.5th at p. 451; *People v. Mungia*, *supra*, 44 Cal.4th at p. 1118.)

ECF No. 13-5, pg. 37.

The Court of Appeal also concluded that the denial of continuance was not so arbitrary as to violate due process.  See id. at 38.

The Court agrees with Respondent that this claim is not cognizable on federal habeas review because it rests entirely on interpretation of state law.  The Court also agrees with Respondent that, even if the claim is cognizable, any error is harmless because the denial of a continuance did not have a substantial and injurious effect on the jury's verdict.  Here, as the state court noted, Petitioner's trial counsel sought a continuance to obtain additional records from CPS. However, trial counsel acknowledged that he had no information about such CPS records, whether they even existed, what they would show, or how they would be relevant.  Moreover, the juvenile court rule that, at the time of the request for a continuance, defense trial counsel had all available records.  To this day, Petitioner has not pointed to any CPS records which were not available to trial counsel at the time of trial which, if now included in the record, would have reasonably resulted in a different outcome.  For this additional reason, Petitioner's claim

15

regarding denial of a continuance fails.

### III.  CONCLUSION

Based on the foregoing, the undersigned recommends that Petitioner's petition for a writ of habeas corpus, ECF No. 1, be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the Court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 2, 2026

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

16